UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
At Martinsburg

CARLA COBLE, STEPHANIE LAING,
JOSEPH NOLAN, ERIC WOOMER,
and POPPY CHRISMAN

        Plaintiffs,

v.
                                   Civil Action No. 3:080cv80
                                   The Honorable John Preston Bailey

RELIANT EQUITY INVESTORS,
L.L.C., TATUM, L.L.C., ROBERT
PULCIANI, PHILIP WAX,
CHRISTOPHER STEVENS
CARR PRESTON, QIAN ELMORE,
THOMAS DARDEN, JR., LARRY
MORGAN, CATHY JO VAN PELT,
KIMBERLY MYERS, ED COLEMAN,
MICHAEL LUTZ, RICHARD
HERBERT and LARRY MUZZY,

        Defendants,

**PLAINTIFFS' MEMORANDUM IN RESPONSE TO MOTION TO DISMISS OF
DEFENDANTS THOMAS DARDEN, JR., AND QIAN ELMORE**

## I. Posture of the Case

Defendants Darden and Elmore (herein defendants) initially filed a motion (with no supporting memorandum) to dismiss for failure to state a claim by essentially denying the allegations of the Third Amended Complaint. Defendants then sought leave to file a supporting memorandum, and leave having been granted, defendant Elmore submitted therewith an affidavit, conclusory in nature and, as will be made clear below, knowingly false in several particulars, denying the allegations of the Third Amended Complaint. Defendants now proceed to argue for summary dismissal under F.R.P., Rule 56 based on a record consisting exclusively of the Elmore affidavit. On June 5, 2008, most of the

1

parties participated[1] in the initial planning meeting.  Rule 26(a)(1) initial disclosures are due on July 8, 2008 and a scheduling conference is scheduled for July 25, 2008.  No discovery is permitted to be exchanged yet and the only document "of record" is the Elmore affidavit.  At the outset, it can reasonably be expected that each defendant will claim, as did Darden and Elmore, that they had no responsibility for the plant closure or the failure to pay the last three weeks of wages, or the time that plaintiffs at the Ranson facility were forced to work off the clock, or the vacation time which employees had earned but for which they were not paid.[2]

## II. Standard for Review

A motion to dismiss for failure to state a claim should not be granted unless it appears to the Court "to a certainty" that the plaintiffs would be entitled to no relief under any state of facts which could be proved in support of the subject claim.  *McNair v. Lend Lease Trucks, Inc.*, 95 F.3d 325, 328 (4th Cir. 1996); *see also Pennington v. Teufel*, 396 F.Supp.2d 715 (N.D. W.Va. 2005), *aff'd* 169 Fed.Appx. 161 (4th Cir. 2006).  A motion to dismiss under Rule 12(b)(6) "tests the sufficiency of the complaint" and is not intended to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Id.*  This aspect of a Rule 12(b)(6) analysis, particularly that the Court is not to resolve the factual issues or the merits of a claim or defense, should be given high regard in the context of the filing of the defendants' motion to dismiss.

---

[1] Defendants Reliant Equities Investors, LLC had not answered and it was the plaintiffs' position that Reliant was in default.  Reliant subsequently executed a waiver of service and agreed to file a responsive pleading in advance of the July 25, 2008 scheduling conference in exchange for the plaintiffs' withdrawal of a motion for default judgment.  Service was accepted at Reliant Equities Investors on behalf of defendant Preston Carr, a Reliant principal during at least some, although perhaps not all, of the time period covered by the Third Amended Complaint, but defendant Carr did not participate personally or through counsel.  A request for waiver of service was subsequently delivered to what is believed to be his home address but to date there has been no response.

[2] These defendants reference the AB&C involuntary bankruptcy regarding an attempt to pay only a fraction of what is owed these plaintiffs.

2

A careful reading of the defendants' motion and memorandum indicates simply a denial of the allegations, an irrelevant citation Pennsylvania's statutory wage law, and an incorrect recitation of West Virginia's common law regarding "persons" who can be independently found liable under the West Virginia Wage Payment and Collection Act. In sum, a wholly inadequate basis for a motion under Rule 12(b)(6). Defendants deny the allegations of the complaint and swear that they had no control at any level, operationally, physically, or financially, over the affairs of AB&C Group, Inc., or for that matter over BlueSky Brands, AB&C's parent holding company, all of which family of companies is owned by Reliant. Defendants now attempt to give weight to what otherwise would be procedural denials to the <u>Third Amended Complaint</u>, which amounts to nothing more than acknowledging a factual contest, by converting those denials into an affidavit and proceeding with a motion under Rule 56.

Summary judgment is appropriate if "the pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Of course, in this matter and at this stage of the litigation, there is no developed record of depositions, discovery responses, or even initial disclosures which "together" the Court could consider the Elmore affidavit. Thus, the Supreme Court's holding in *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), "where the record **taken as a whole** cannot lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," presumes a competent and reliable record.

3

## III. **Argument**

### A. The Elmore affidavit is conclusory, incomplete, misleading and perjurious

Under Rule 56, an affidavit "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." The information contained in an affidavit must be admissible at trial and should follow substantially the same form as though the affiant were testifying in Court. Wright and Miller, Vol. 10B, § 2738. In the context of this case, a more specific template for review of the affidavit will be useful for the Court. The defendants cannot manufacture a record leading this Court to conclude that no issues of material fact exist when inconsistencies can be found between the Elmore affidavit and other documents of defendants' self authenticating public records even at this early stage of the litigation. *See generally Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984).

As to the "factual" side of their argument, defendants have laid down the gauntlet of what they feel must be proven by plaintiffs: "Elmore and Darden are directors and members of Reliant, but they are not **involved in any capacity** in the management of AB&C. To the contrary, Reliant, BlueSky and AB&C are all separate and distinct companies, with **separate and distinct funds, property, addresses, office space, and officers, and only one common director**. The companies **each act differently from one another**." Defendants' memo at p. 2 [citing Elmore affidavit]. Defendants repeat these assertions, with additional hyperbole, in contesting the "alter ego" status of the defendants: "AB&C, BlueSky and Reliant are separate and distinct entities. They operate **entirely** independently from one another. **They possess different offices,**

**addresses, employees, directors, officers and function independently.**" Defendants'
memo at p. 9.

The essence of defendants' memorandum argument cited above is premised on
paragraph 6 of the Elmore affidavit.  For analytical purposes plaintiffs dissect that
paragraph of the affidavit looking at the operational, financial, managerial and physical
control and interrelationships among all defendants and by these defendants and by and
among the family of Reliant companies.

The Reliant family of companies is so completely dependent and conjoined that,
in a legal sense, there are few material distinctions which can be made by and between
these actors.  These defendants are the progenitors of the BlueSky Brands holding
company which in turn operates a collection of wholly owned catalogue companies
(Paragon, Bits and Pieces, National Wildlife Direct, Winterthur Direct)[3] and the former,
but now defunct, affiliated order fulfillment company AB&C Group, Inc.

First, AB&C, Reliant and BlueSky collectively shared funds and loan obligations.
The entirety of the BlueSky companies acted as co-borrowers on a line of credit with
Sovereign Bank: "For value received, Bluesky Brands, Inc., a Delaware corporation
("Parent"), the Paragon Gifts Holdings Inc., a Delaware corporation ("Holdings"), the
Paragon Gifts, Inc., a Rhode Island corporation ("Paragon"); Bits & Pieces, Inc., a
Delaware corporation ("B&P") and AB&C Group Inc., a Virginia corporation ("AB&C";
Parent, Holdings, Paragon, B&P and AB&C are herein sometimes referred to

---

[3] According to press reports, it appears that the defendants sold Bits and Pieces.  Transactional details
regarding the sale are not yet available given the stage of the litigation.

individually as a "Borrower" and collectively as "Borrower"), hereby **jointly and severally** promise to pay to Sovereign Bank...." [Ex A, emphasis added].[4]

The joint and several borrowing practices, evidenced in the note documents, of the BlueSky/Reliant "family" of companies was approved by, and backed by a guaranty signed by, defendant Darden on behalf of Reliant Equity Investors: "For Good and Valuable Consideration, the receipt and adequacy of which are hereby acknowledged, each of the undersigned Guarantors [Reliant/Darden] hereby **consents** to the Borrowers' execution, delivery and performance of the Fifth Amendment to Amended and Restated Secured Revolving Credit Noted dated February 4, 2008 (the "Amendment"), and hereby ratifies and affirms its Amended and Restated Guaranty dated as of September 21, 2007, ...."[5] [Ex. B, emphasis added].  Darden's and Reliant's consent to the loans made to their family of companies, and their guaranty to the inseparable borrowing and debt practices of their companies is, quite simply, not acting "completely independently" from one another.  To the contrary, they are completely intertwined.

In addition to the loan and financing obligations, the Reliant family of companies entered into a "Master Lease Agreement" with Sovereign Bank financing the lease of equipment by and for all of the Reliant family of companies. [Ex. C]. Each of the companies is identified as "co-lessee" for equipment and software located throughout and used by each member of the Reliant family of companies including the Ecometry

---

[4] Plaintiffs do not have all the loan underwriting and loan processing documents but have five amended agreements that were included within Sovereign's secured creditor claim filed in AB&C's bankruptcy proceedings.  Plaintiffs include in this exhibit, for brevity sake, the first page or two of each of the five amended credit notes and the related signature pages.
[5] Plaintiffs do not yet have Darden's/Reliant's first amended consent and guaranty referenced as dated September 21, 2007.

software[6] used by AB&C and shared among the affiliate companies.  Indeed, the lease agreement is executed by one person, Michele Wood, a management officer for and on behalf of each member company of the Reliant family of companies.  Id.

Second, on March 27, 2008, Reliant and its family of companies entered into an agreement with Sovereign Bank allowing for the liquidation of all assets for all the companies owned by Reliant.  [Ex D].  The agreement was signed on behalf of BlueSky, by Robert Pulciani who insisted under his signature that he was signing as "CEO & authorized signature of BlueSky Brands, Inc., only."[7]  Id.  The agreement was accepted by, and signed on behalf of, Bits & Pieces, Inc., The Paragon Gifts Holdings, Inc., AB&C Group, Inc., National Wildlife Direct, Inc., and Winterthur Direct, Inc., by A'dele Langham, as collectively, their "authorized representative."  Id.

Ms. A'dele Langham is not found listed in various state business databases as an officer or director of any of the companies for which she signed as "authorized representative" with the executory and legally valid corporate power to commit those companies to a complete liquidation of inventory and assets, and the closure of operations including at AB&C.  Ms. A'dele Langham, however, is identified as the "Administrative Director" of Reliant Equity Investors, where she is employed by defendants Elmore and Darden.  [Ex E].  Liquidating inventory of the Reliant/BlueSky family of companies including AB&C, and selling Bits & Pieces, Inc., in order to avoid liability under the Reliant borrowers guaranty signed by defendant Darden is, quite simply, not acting "completely independently" from one another.

---

[6] This is an extraordinarily expensive integrated software package designed to run front-end and back-end catalog order and fulfillment, among other things, for multiple companies.
[7] The Elmore affidavit states that Pulciani is president of AB&C yet Pulciani made a point of not signing on its behalf.

In addition, an attorney at an AB&C bankruptcy hearing who was apparently representing certain of the interests of Reliant[8] argued as follows:

> First of all, it was basically a carve-out.  Sovereign Bank had a lien on all assets of numerous debtors including AB&C but also including a company called Bits and Pieces.  Bits and Pieces is a Delaware Corporation which is a wholly owned subsidiary of Paragon Gift Holdings.  AB&C Group is a Virginia Corporation which is a wholly owned subsidiary of Blue Sky Brands.  **Ultimately as you go up the chain you reach Reliant who—Reliant Equity who is in control of--- not necessarily control of but they're over all of these companies.  And Reliant Equity Partners, LLC, is the general partner**.  [Transcript of Bankruptcy Court proceedings, ex. F].

In this litigation, these defendants argue that Reliant is "completely independent" from the companies which it owns; in other federal litigation pending in Bankruptcy Court, Reliant is represented to be "over all of these companies [in the chain of command]" but maybe or maybe not necessarily in control but is a "general partner" with its family of companies, including AB&C.  The contradictory positions asserted by Reliant in different forums are alone enough to warrant denial of this motion to dismiss or for summary judgment.

Third, BlueSky and AB&C are guarantors and the beneficiaries of a loan/lease agreement involving the West Virginia Economic Development Authority, the West Virginia Infrastructure and Jobs Development Council, and the Berkeley County Economic Development Authority obligating BlueSky and AB&C as guarantors to a total of about four million dollars of State money used to purchase equipment for the Martinsburg facility.  [Ex G].[9]  With respect to the first two million dollars of the loan money, BlueSky was identified by the West Virginia Economic Development Authority

---

[8] Although she introduced herself as AB&C's counsel in an involuntary Chapter 7 proceeding to which AB&C did not object, that is not possible:  the Trustee in a Chapter 7 bankruptcy is AB&C as a matter of law.

[9] Plaintiffs do not yet have all documents regarding these transactions.  For brevity, plaintiffs attach the first page and the signature pages.

as the actual tenant of the Martinsburg facility. [Ex. H]. Joint borrowing and purchasing practices of these companies is, quite simply, not acting "completely independently" from one another.

At the operational and management level, Reliant and these defendants, while now denying any management involvement with the companies they own, actually advertise the opposite. On its website, Reliant advertises a "management-centric approach" stating that "the extensive investment and operating experience of the Reliant team enables the Firm to add value post closing and support management on strategic issues, growth initiatives, acquisitions, and financings." These defendants further maintain that they "leverage a unique network of executives, professionals, and service providers through corporate board participation, professional, political, and educational affiliations, and advisory board associations, to complement and enhance Reliant's management-centric approach." [Ex. I]. Reliant and these defendants advertise that "we partner with management to develop a value creation plan that will grow the business both organically and through acquisitions." Id. The Reliant "management-centric" approach as advertised and then amply manifested by the exhibits attached and so far obtained in this litigation show, quite simply, AB&C, BlueSky, and Reliant are not acting "completely independently" from one another.

Even at the level of data management, these companies are fully integrated. BlueSky, the purported holding company deployed Oco, an integrated business information management system, for use across the entire BlueSky Brands portfolio of companies. The Oco solution, according to the Chief Information Officer for BlueSky, "provided us with immediate standardization of operational reports across brands,

regardless of platforms that the information systems ran on." [Ex. J, see also the bank lease agreement wherein the software, etc, is co-leased at ex. C].  A fully integrated information management system used by all "brands" within the Reliant/BlueSky family of companies is not acting "completely independently" from one another.

Next, with respect to the sharing of offices, property and even employees, Elmore's affidavit is demonstrably false and, likely, perjurious. On January 29, 2008, defendant Pulciani, as Chief Executive Officer of BlueSky Brands Holdings, Inc., wrote a letter to BlueSky, Paragon and AB&C employees informing them that they would be losing their jobs due to a plant shutdown.  [Ex. K].  While this letter was not sent to the AB&C employees in West Virginia whose plant was shut down at around the same time, it states clearly that these companies operate together in one location: "BlueSky Brands, Inc., AB&C Group, Inc., and The Paragon Gifts, Inc., presently operates a plant at 89 Tom Harvey Road, Westerly, Rhode Island 02891."[10]  Id.  The employees are then directed to contact the "Human Resources Manager" at BlueSky, not AB&C or Paragon, if they had any questions.  That reality of shared plant operations at one location directly contradicts Elmore's statement these companies "all have separate and distinct office space, funds, and property" and "act completely independently form one another" as well as defendants' argument that they **possess different offices, addresses, employees, directors, officers and function independently."**

Finally and only given the early stage of this litigation, the Elmore statement that "these companies **each** have different management officers, with the exception of Robert Pulciani who is president of both BlueSky and AB&C" is deceptive and misleading.

---

[10] The letter informs the employees of a plant shut down date of March 31, 2008 but which was actually closed about two weeks sooner

When Robert Pulciani became "president of both" is a question which will be answered in discovery but for sure it was a *nome de jur* of recent vintage very close in time to the plant closures if at all.[11]  In any event the entire family of Reliant/BlueSky companies has shared "management officers" since and throughout Reliant's installment of its "management-centric" approach leading to plant closure.[12]  Beginning with Ex. D, Reliant's Administrative Director, A'dele Langham is signing documents for every Reliant company except BlueSky.  Phil Wax, a named defendant, according to the Secretary of States databases for Rhode Island and West Virginia served as Chief Financial Officer for both BlueSky and AB&C, and Secretary and Treasurer for Paragon. Anthony Sansone, who, according to  Ex. J,integrated data management operations between and among the Reliant/BlueSky family of companies was Chief Information Officer for both BlueSky and AB&C.   Michele Wood, as seen in Ex. C, executed lease finance agreements as a corporate management officer for each of the members of Reliant's family of companies all from her office in Rhode Island.  Much the same practice is evidenced in the bank loan and note amendments.  [Ex. A].  Others who served as management officers for multiple Reliant companies include Richard Hebert and Carr Preston (Reliant principal and Vice President of Paragon).[13]  These companies each do not have different management officers contrary to the Elmore affidavit and contrary to defendants' argument that they **possess different offices, addresses, employees, directors, officers and function independently."**

---

[11] Again, defendant Pulciani refused to sign exhibit D on behalf of AB&C as of  March 27, 2008.
[12] This account of shared management officers is not intended to be complete as to all who have undertaken such roles or as to the various and different roles any person has served.  It is simply a summary of what to date has been learned provided the Court to address the falsity of the Elmore affidavit.
[13] Defendants Elmore and Darden were far too modest in their own resume having served, consistent with their "management-centric approach", as directors on at least Paragon as well.

**B. Defendants misstate the applicable law**

With the Elmore affidavit and corresponding memorandum argument facing serious scrutiny, it is anticipated that defendants will claim to have little need for the affidavit given their recitation of their understanding of individual liability under the West Virginia Wage Payment and Collection Act. Defendants further argue that, as a matter of law, their liability is derivative of a finding of liability first on the part of the corporation, and, thus, bankruptcy "precludes" any action under the Act. However, defendants misstate the applicable law.

As a backdrop the Wage Payment and Collection Act defines the term 'employee' to include "any person suffered or permitted to work by a person, firm or corporation." And, the Act itself was adopted to further an important public policy: "This public policy requires employers to pay the wages of working people who labor on their employer's behalf." *Mullins v. Venable*, 171 W. Va. 92, 96, 297 S.E.2d 866, 871 (1982). Corresponding to the definition of employee, an employer "means any person, firm or corporation employing any employee." Read together, the West Virginia Supreme Court of Appeals has consistently held that the Act goes beyond the traditional notion of the employment relationship. This provision is different from, and broader than, the common law definition of an "employee." *See Rowe v. Grapevine Corporation*, 193 W. Va. 274, 456 S.E.2d 1 (1995). The statutory definition of employee under the WPCA "is different from and broader than the common law definition of an 'employee'." *Mullins*, 171 W. Va. 92. In discussing the term "**any**" found in the definitions of employee at W. Va. Code § 21-5-1(b), the West Virginia Supreme Court of Appeals applied the term to include as an employee subject to protection under the WPCA **any** person "without

12

specification or identification" who "suffered or permitted to work." *Shaffer v. Ft. Henry Surgical Assocs.*, 215 W. Va. 453, 458-9 (2004). [Emphasis added].

Defendants confuse the very core terms of the Act. Defendants argue that, even though they were directors serving at any given time on any of the clearly related family of Reliant companies, the term "director" is not expressly included in the Act, and claims that these defendants were not officers of AB&C. The Act, again, covers "any" person who suffers or permits another person to work for a "**person, firm** or corporation." The term "firm" includes any "partnership, association, joint-stock company, or officer thereof, employing any person." Officer in turn is defined to "include officers or agents in the management of a corporation or firm." The term officer, first, is itself broadly defined to include an agent acting on behalf of a firm. Further the term "officer' does not limit the term "person" so as to exclude liability on the part of directors, and in this case, owners as Elmore's affidavit makes clear that they were the owners of the entire family of Reliant/BlueSky companies including AB&C.

As the West Virginia Supreme Court of Appeals has held: "The Act is comprehensive in its requirements that all employers, be they natural persons, associations of persons (firms), or juristic persons (corporations), must comply with its provisions [and] W.Va. Code § 21-5-1(h) further indicates the Legislature's recognition that corporations act through persons, and that persons must ultimately be responsible for corporate actions." *Mullins*, 171 W. Va. at 94. Thus, defendants' argument asking for a limitation on the coverage of the Act is entirely misplaced and inconsistent with the case law and the purposes of the legislation.

Oddly, defendants argue *Erie* doctrine principles but fail to cite, other than a nod to *Mullins*, core West Virginia case law on the Wage Payment and Collection Act addressing the legal argument they have attempted to advance. In *Goodwin v. Willard*, 185 W. Va. 321 (1991), Alan Lively, a part owner of the corporate employer, argued as with these defendants that, because he was not an officer of the company (and was not found to have been listed as such in the articles of incorporation), he could not be found liable as a matter of law. The employees were laid off without having been paid all wages and fringe benefits owed to them. Lively was, however, much like these defendants and their company Reliant, co-guarantors on a loan.[14] The Supreme Court of Appeals reversed a lower court order granting Lively's motion to dismiss or for summary judgment holding that whether an investor was acting as an agent in the management of the corporation and actively participating in the business presented issues of fact to be tried before a jury. *See also Saunders v. Tri-State Block Corp.*, 207 W. Va. 616 (2000) (issue of fact as to the actual employer); *Rowe v. Grapevine Corporation*, 193 W. Va. 274 (W. Va. 1995) (joint employer liability as between and among the corporation, shareholders and individuals who "permitted" employees to work on their property).

Exhibit D shows A'delle Langham, a Reliant employee, acting as agent for AB&C at or around the time of the closing of the entire family of Reliant companies. Evidence of common ownership and control has been presented even though there have been no initial disclosures and no discovery. As the defendants have invoked *Erie*, so to do plaintiffs and, therefore, seek a trial by jury.

Defendants argue a Pennsylvania decision under Pennsylvania's Wage Payment Act to suggest that any action against these defendants is "precluded" by the AB&C

---

[14] Of the other owners, Willard, much like AB&C, had filed bankruptcy and Morgan was incarcerated.

Chapter 7 involuntary bankruptcy proceeding. Having earlier argued the *Erie* doctrine, defendants then argue the application of Pennsylvania wage law to West Virginia's own Act. Pennsylvania law, as is made clear in the defendants' argument, only allows for liability as against corporate managers contingent upon a finding of liability against the corporation. In other words, individual liability is derivative of the liability of the corporation. Therefore, defendants maintain, based on Pennsylvania law, this action is precluded.

Defendants again ignore clear holdings of the West Virginia Supreme Court of Appeals directly addressing the individual liability under the Wage Payment and Collection Act. In *Mullins*, 171 W. Va. 92, the Court held:

> The appellee further argues that before the appellants can maintain an action seeking to hold him personally liable for unpaid wages, fringe benefits and liquidated damage, they must first obtain a judgment against the corporate entity and show that the execution thereon has been returned unsatisfied. We find no merit in this argument. As a general rule, where the liability of corporate officers is direct and absolute, it is not necessary that a judgment be recovered against the corporation before maintenance of an action seeking to hold the officer liable. [citation omitted]. *Id.*, at 95-6.

The Court continued: The Wage Payment and Collection Act, however, does not create a suretyship relationship between the corporation and its officers with respect to unsatisfied wage claims. Rather, the Act places liability directly upon a corporate officer who knowingly permits the corporation to violate the Act." *Id.*, at 96. *Mullins* further held that it was not necessary for employees to sue and recover first from their actual employer, the subcontractor, before proceeding against the prime contractor. *Id.*, at 96. *See also Britner v. Medical Security Card, Inc.*, 200 W. Va. 352 (1997) (holding that an officer and director can be held personally and directly liable without recourse first to the

15

corporation); *Goodwin*, 185 W. Va. 321 (it was of no import that a co-investor was bankrupt; employees could proceed against the non-bankrupt investor).

## IV. <u>Conclusion</u>

Defendant Elmore's affidavit is substantively false. Not only does it contain conclusory and entirely misleading statements, but in seeking a swift dismissal before any discovery can be conducted, it willfully omits any mention of, for example, defendant Darden's February 4, 2008 guaranty and consent to financing the Reliant family of corporations by Sovereign Bank and A'dele Langham's March 28, 2008 consent on behalf of the entire family of Reliant corporations to liquidation by Sovereign Bank. It is inconceivable that defendant Elmore "forgot" about these events when he executed his affidavit on June 9, 2008. Clearly and convincingly, defendants by these willful omissions intended to deceive this Court and should be sanctioned.

Plaintiffs respectfully asked that defendants motion to dismiss be denied and that the plaintiffs be awarded their costs in defense thereof.

Dated this the 26th day of June, 2008.

_Robert J. Schi_____

David M. Hammer, Esq., #5047
     dhammer@hfslawyers.com
Robert J. Schiavoni, Esq., #4365
     rschiavoni@hfslawyers.com
HAMMER, FERRETTI & SCHIAVONI
408 West King Street
Martinsburg, WV 25401
(304) 264-8505


        /s/
_____
Garry G. Geffert, Esq., #1364
     geffert@wvdsl.net
P. O. Box 2281
Martinsburg, WV 25402
(304) 262-4436

Counsel for the Plaintiffs and Plaintiff Class

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN
DISTRICT OF WEST VIRGINIA

CARLA COBLE,
STEPHANIE LAING,
JOSEPH NOLAN,
ERIC WOOMER,
POPPY CHRISMAN,

          Individually and as
          Class Representatives,

vs.                              Civil Action No.  3:08CV80
                              JURY TRIAL REQUESTED

RELIANT EQUITY INVESTORS, LLC,
a foreign limited liability company,
TATUM, LLC, a foreign limited liability
company, and the following as individuals:
ROBERT PULCIANI, PHILIP WAX,
CHRISTOPHER STEVENS, CARR PRESTON,
QIAN ELMORE, THOMAS DARDEN, JR.,
LARRY MORGAN, CATHY JO VAN PELT,
KIMBERLY MYERS, ED COLEMAN,
MICHAEL LUTZ, RICHARD HEBERT, and
LARRY MUZZY,

          Defendants.

## CERTIFICATE OF SERVICE

I hereby certify that service of a true copy of the foregoing has been made as follows:

Type of Service:             Via Electronic filing and email

Date of Service:             June 26, 2008

Persons served and address:     William J. Powell
                                 Seth Hayes
                                 Jackson & Kelly
                                 310 West Burke Street
                                 Martinsburg, WV  25401

Craig W. Snethen
A. Patricia Diulus-Myers
Jackson Lewis LLP
1225 Market Street
Wheeling, WV  26003

Michael Scales
Greenberg & Scales
314 W. John St.
P.O. Box 6097
Martinsburg, WV  25402

Avrum Levicoff
Levicoff, Silko & Deemer
Centre City Tower, Suite 1900
650 Smithfield St.
Pittsburgh, PA  15222

Garry Geffert
114 Maple Avenue
PO Box  2281
Martinsburg, WV  25402

Craig Boggs
131 S Dearborn St.
Suite 1700
Chicago, IL 60603

Warren Hall, Jr.
3340 Peachtree Rd NE
Suite 1780
Atlanta, Georgia 30326

Item(s) Served:                    Plaintiffs' Memorandum in Response to Motion to Dismiss
                                   of Defendants Thomas Darden, Jr. and Qian Elmore

_____/s/_____
Robert J. Schiavoni